UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| KURT B. KROGER, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 04-2189 (ESH) |
| LEGALBILL.COM LLC, | ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM OPINION AND ORDER**

In this action brought pursuant to 28 U.S.C. § 1332, plaintiff Kurt Kroger ("Kroger"), who is proceeding *pro se,* has filed suit against his former employer, Legalbill.com, LLC ("Legalbill" or "the Company") for breach of contract, fraud, and negligent misrepresentation. Presently before the Court is defendant's motion for summary judgment.

**BACKGROUND**

Legalbill.com is a Tennessee company specializing in the auditing and analysis of legal bills submitted to corporate clients by their outside counsel. (Def.'s Stmt. of Undisputed Facts ("Def. Stmt.") ¶ 1.) Stephen French is the managing partner, and Jeff McCandless is the Chief Technology Officer. (*Id.* ¶¶ 3-4.) Both are owners of the Company. (*Id.*)

Plaintiff is an American lawyer who has practiced in the District of Columbia and California. Plaintiff has also worked as a salesman for internet start-up companies. (*Id.* ¶¶ 8-9.) He moved to Paris in late 2001 when his wife was offered a one-year position there. (Pl.'s Opp. to Def.'s Mot. ("Pl.'s Opp.") at 3.)

In early 2002, while Legalbill was contemplating expanding its operations to Europe, plaintiff sent French a letter of introduction and a copy of his resume. (Def. Stmt. ¶ 5.) In February 2002, plaintiff met with French and McCandless in London, England to discuss Legalbill's general operations, and in June he met again with French, this time in Paris, to discuss a potential position with Legalbill. (*Id.* ¶¶ 11-13.) Thereafter, plaintiff flew to Nashville, Tennessee in September to continue discussions at Legalbill's headquarters. (*Id.* ¶ 14.) Legalbill made plaintiff an offer of employment, and the parties agreed to reduce the terms of employment to writing. (*Id.* ¶¶ 15-16.)

The parties subsequently negotiated the terms of plaintiff's employment and exchanged drafts of the agreement. (Def. Stmt. ¶ 17.) Plaintiff and Legalbill disagreed over whether an "at-will" provision should be included. (*Id.* ¶¶ 18-19.) Ultimately, Legalbill insisted that the contract contain an "at-will" clause, and plaintiff signed a final version of the contract. The agreement was dated January 9, 2003. (*Id.* ¶ 18.)

Pursuant to the contract, plaintiff's official title was Managing Director of the Europe, Middle-East, and Africa ("EMEA") region, and according to the first paragraph, plaintiff's employment was to be "at will." (Contract at 1.) Plaintiff was to be responsible for sales of Legalbill's products and services in the EMEA region. (*Id.*)

Other relevant terms of the contract provided that Legalbill would charter a limited liability company in Switzerland ("Swiss LLC") through which plaintiff was to offer Legalbill's services. (Contract at 1.) No deadline or time frame was set forth in the contract.

Plaintiff was to be provided a base pay: $3000 per month during the period of October through December of 2002, $4000 per month during the period of January through March of

2003, $5000 per month during the period of April through June of 2003, $6000 per month during the period of July through September of 2003, and $7000 per month during the period of October through December 2003. (Contract at 1.) This salary would be paid monthly in accordance with Legalbill's normal payroll practices. (*Id.*) In addition to plaintiff's salary, starting in January 2003, plaintiff would be entitled to receive a commission of 5% on revenues collected from the Swiss LLC and from Legalbill's EMEA sales. (*Id.* at 2.) This right to receive commissions would cease after plaintiff became entitled to receive an equity ownership in a yet to be formed company (Swiss LLC), and plaintiff's equity distributions exceeded his commission. (*Id.* at 3.)

Plaintiff was to become eligible to receive an equitable interest in the Swiss LLC, beginning January 1, 2004. (Contract at 3.) The equitable interest would start at 2% in 2004 and increase on January 1 of each subsequent year until 2007. Eligibility for this ownership interest required that plaintiff be employed with Legalbill as of January 1, 2004 and through each relevant year thereafter. (*Id.*) Plaintiff could not, however, be "terminated without cause so as to deny [him] forthcoming equity ownership interests." (*Id.*) "Termination for Cause" was defined to include termination of employment "for (1) failure or refusal without proper cause, to substantially perform [] duties as an employee of [Legalbill] or for material breach of this agreement and the covenants of good faith and fair dealing between the Company and employee . . . ." (*Id.*) Legalbill promised to buy out plaintiff's ownership in the Swiss LLC, should plaintiff be terminated for "any reason whatsoever." (*Id.*)

The contract required Legalbill and its executives to act "in good faith and a fair dealing manner, including devoting their best efforts and energy to employee's success and the success of the business and affairs of the Swiss LLC and [Legalbill]." (Contract at 3.) Legalbill was also

3

required to "supply all necessary technology and apply for and obtain any and all insurance, permits, licences and authorizations necessary for employee's and the Swiss LLC's operation. (*Id.* at 3.)  Plaintiff was to be reimbursed by Legalbill for "any reasonable direct out-of-pocket ordinary and necessary business expenses incurred in the performance of [plaintiff's] services" for Legalbill. (*Id.*)  Legalbill would also reimburse plaintiff's monthly premium payments for medical or dental insurance coverage.  (*Id.*)  In addition, Legalbill would provide tax-equalization to assure plaintiff's effective tax rate equaled the rate in the United States.  (*Id.*)

An integration clause stated that the contract constituted the "entire agreement" between the parties, and "all prior agreements or understandings concerning [plaintiff's] employment with the Swiss LLC or [Legalbill were] hereby cancelled and superseded by this [contract]." (Contract at 5.)  This clause also stated that the agreement could not be changed orally, but "only by an amendment in writing signed by [plaintiff] and [Legalbill]."  (*Id.*)

Finally, the contract provided that it was to "be governed and interpreted in accordance with the laws of the United States."  (Contract at 6.)

Throughout early 2003, plaintiff continued to work in Paris.  Several emails were exchanged wherein plaintiff asked defendant to make changes to the Legalbill website and to provide marketing materials for distribution to prospective clients.  At some point, plaintiff and Legalbill representatives met with London-based attorney Wendy Paige to discuss whether the Swiss LLC was the best entity through which to conduct Legalbill's business.  (Kroger Dep. at 361:15-20.)  Paige suggested that a Legalbill Limited company ("Legalbill Ltd.") based in England would have greater tax benefits for plaintiff and Legalbill than the proposed Swiss LLC.

4

(Kroger Dep. at 361:15 -20; 354:3-11; 366:6; 364:2-4.)  The parties subsequently formed Legalbill Ltd.  (*Id.* at 363:20 – 364:1.)  Plaintiff maintains that, although he did not oppose the creation of Legalbill Ltd, he requested and received assurances that his contract would be amended.  (Kroger Decl. ¶¶ 24, 47.)

According to plaintiff, he made contact with some potential clients and set up meetings in late February and early March so that he and French could pitch Legalbill's services.  (Kroger Decl. ¶ 37.)  In particular, plaintiff arranged a meeting in Germany for himself, French, and Deutsche Lufthansa AG ("Lufthansa"), at which time Lufthansa agreed to submit legal invoices to Legalbill for a free trial period.  (*See id*. ¶ 51.)  A later meeting was scheduled in Washington D.C. with Lufthansa personnel and Lufthansa's United States outside counsel, Wilmer, Cutler, & Pickering ("WPC").  At some point, Kroger signed a service agreement, allowing Lufthansa to make payments to Legalbill U.S.A.  (*Id*. ¶ 46; *see also* Von Ruckteschell Decl. ¶ 7.)

After the Washington D.C. meeting with WPC, plaintiff had dinner with French.  Plaintiff alleges that he sought and received assurances that EMEA operations were proceeding as planned.  (Kroger Decl. ¶ 55.)  Kroger contends that he explained to French that he and his wife had started the process of selling their house in Seattle and would not finalize a sale if there was any chance that his employment with Legalbill might be discontinued.  (*Id*.)  Plaintiff also met with French in Amsterdam in September 2003.  At this meeting, plaintiff allegedly had a similar discussion with French and again received the same assurances.  (*Id*.)  At some point, Kroger sold his house in Seattle.  (*Id*.)

Plaintiff continued his marketing efforts for Legalbill in Europe through late 2003 when French informed plaintiff that defendants were reconsidering whether to continue to have staff in

Europe. According to plaintiff, he was told on December 19, 2003 that defendant was going to terminate him because it had decided not to incur the expense of having an employee in Europe. (Kroger Decl. ¶ 41.) Defendant also sent plaintiff a written termination agreement dated December 31, 2003. (Def. Stmt. ¶ 42.) Plaintiff claims he received the document on January 2, 2004. (Kroger Decl. ¶ 41.) He also alleges that when he complained about being terminated, French said that defendant wanted to spend its resources in the United States, not in the EMEA region, and that since plaintiff was an "at will" employee, it was defendant's prerogative to shift its focus. (*Id.*)

The termination notice stated: plaintiff's employment was to end on midnight of December 31, 2003. (French Decl., Ex. B ("Termination Agreement") at 1.) Plaintiff would continue to receive compensation and continue to work with Legalbill management through January 31, 2004, in order to transition his responsibilities. (*Id.*) In consideration of payments made, plaintiff was to release any claim against Legalbill under the contract relating to his equity ownership in the Swiss LLC and agree that he had been paid all compensation that was due and owing. (*Id.*) The letter did not specify any cause for the termination. Plaintiff never signed the termination agreement, but instituted this action for breach of his employment contract, fraud and negligent misrepresentation. In addition to damages, plaintiff also seeks the imposition of a constructive trust arising out of his employment in the EMEA region and his termination by defendant. Defendant has moved for summary judgment on all counts.

## ANALYSIS

### I. Choice of Law

Before addressing the merits, the Court must determine which jurisdiction's laws should

be applied to resolve plaintiff's claims.  Plaintiff argues for the application of French law because he was living in and working full-time for defendant in France.  (Pl.'s Opp. at 14.)  Defendant points to the choice of law provision in the parties' contract to support its contention that United States law, and more specifically Tennessee law, should be applied to the issues in the case.

As the Court has previously stated, French law does not govern this dispute.  *Kroger v. Legalbill.com LLC, et al.*, Civ. No. 04-2189, at 7 (D.D.C. April 8, 2005) (Mem. Op.) (dismissing Count V, which alleged French Labor Code violations).  In diversity cases, the court looks "to the District of Columbia for the applicable choice of law principles."  *Gray v. American Express Co.*, 743 F.2d 10, 16 (D.C. Cir. 1984); *Godbey v. Frank E. Basil Inc.*, 603 F. Supp. 775, 776-77 (D.D.C. 1985)  The District of Columbia Court of Appeals has adopted the general rule "that parties to a contract may specify the law they wish to govern, as part of their freedom to contract, as long as there is some reasonable relationship with the state specified."  *Norris v. Norris*, 419 A.2d 982, 984 (D.C. 1980); *see Ekstrom v. Value Health, Inc.*, 68 F.3d 1391, 1394 (D.C. Cir. 1995); *cf. Godbey*, 603 F. Supp. at 776 (applying this choice of law principle to a contractual provision stating that Saudi Arabian law should govern an employment agreement between a United States citizen and a Saudi Arabian company).  Here, the parties' contract contains a choice of law clause clearly stating that United States law should govern any dispute regarding the contract's interpretation.  Because there is a reasonable relationship to the United States – defendant Legalbill operates principally in the country, *see Ekstrom*, 68 F.3d at 1394 – the Court will enforce the parties' choice of law clause.

The contract's choice of law provision, however, does not settle the issue, as it fails to specify which state's laws should govern the action.  Under District of Columbia conflicts law, a

court must apply the law of the state that has the "most significant relationship" to the parties and the transaction. *Hercules & Co., Ltd. v. Shama Restaurant Corp.*, 566 A.2d 31, 41 n.18 (D.C. 1989); *see also Nationwide Mut. Ins. Co. v. Richardson*, 270 F.3d 948, 953 (D.C. Cir. 2001); *Eli Lilly & Co. v. Home Ins. Co.*, 764 F.2d 876, 882 (D.C. Cir. 1985); *Greycoat Hanover F St. Ltd. P'ship v. Liberty Mut. Ins. Co.*, 657 A.2d 764, 767-68 (D.C. 1995). The aim of the analysis is to determine which jurisdiction's policies would be furthered by resolving the underlying dispute pursuant to its law. *Hercules & Co.*, 566 A.2d at 41 n.18.

Regarding interpretation of a contract, the District of Columbia determines the state with the "most significant relationship" to the dispute using the analysis outlined in § 188 of the Restatement (Second) of Conflict of Laws. *Clayman v. Goodman Properties, Inc.*, 518 F.2d 1026, 1030 n.22 (D.C. Cir. 1973); *see also Century International Arms, Ltd v. Federal State Unitary Enterprise State Corporation "Rosvoorouzheinie,"* 172 F. Supp. 2d 79, 89 (D.D.C. 2001); *Koro Co. v. Bristol-Myers Co.*, 568 F. Supp. 280, 286 (D.D.C. 1983); *Legg, Mason & Co. v. Mackall & Coe, Inc.*, 351 F. Supp. 1367, 1370 n.2 (D.D.C. 1972); *Eli Lilly & Co.*, 764 F.2d at 882; *Owen v. Owen*, 427 A.2d 933, 937 (D.C. 1981). Five factors influence the determination: (1) the place of contracting, (2) the place of negotiation of the contract, (3) the place of performance of the contract, (4) the location of the subject matter of the contract and (5) the place of incorporation and the place of business of the parties. *Koro Co.*, 568 F. Supp. at 286; Restatement (Second) of Conflict of Laws § 188(2)(1971); *see also In re Parkwood Inc.*, 461 F.2d 158, 172 n.28 (D.C. Cir. 1971); *Century Int'l Arms,* 172 F. Supp. 2d at 89.

With respect to claims of injury, the District applies the analysis outlined in § 145 of the Restatement. *See Bryson v. Gere*, 268 F. Supp. 2d 46, 55 (D.D.C. 2003). Considerations

include: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship is centered. *Id.*; Restatement (Second) of Conflict of Laws § 145.

The Court concludes that Tennessee law governs the interpretation of the parties' contract. Tennessee is the site of both the primary contract negotiations and Legalbill's headquarters. (Complaint ¶ 22; Kroger Dep. at 137:5-12.) Regarding the contract's subject matter, plaintiff's position as EMEA managing director entailed plaintiff living in Europe and communicating regularly with Legalbill via the Tennessee headquarters. (Contract at 1.) Moreover, since no other state has contacts that are as substantial as those of Tennessee, it is appropriate to look to Tennessee law.

Tennessee law also governs plaintiff's claims of fraud and misrepresentation. Although plaintiff complains that misrepresentations were made in both the District of Columbia and Tennessee, the parties' residences and employment relationship weigh in favor of applying Tennessee law. Defendant is based in Tennessee, while plaintiff makes no claims of residence in the District. Tennessee is the state most central to the parties' relationship, considering that most communications involved plaintiff, who was located in Europe, and Legalbill's headquarters in Tennessee. (French Decl. ¶¶ 5, 13, 25.) The Court's above determination that the contract is governed by Tennessee law also reinforces its conclusion that Tennessee is the jurisdiction with the more significant relationship to the parties' dispute over various alleged misrepresentations.

## II. Summary Judgment

Under Rule 56, the Court shall grant summary judgment if the pleadings, depositions,

answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party may successfully support its motion by informing the district court of the basis for its motion, and identifying those portions of the pleadings and evidentiary materials which it believes demonstrate the absence of a genuine issue of material fact.  *Id.*  In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor.  *See Liberty Lobby, Inc.*, 477 U.S. at 255.  In addition, a court "may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *see also Washington Post Co. v. United States Dep't of Health and Human Servs.,* 865 F.2d 320, 325 (D.C. Cir. 1989).  A dispute about a material fact is genuine and should preclude summary judgment if a reasonable jury could return a verdict in favor of the non-moving party.  *Liberty Lobby, Inc.*, 477 U.S. at 242.  However, the nonmoving party's opposition must consist of more than mere unsupported allegations or denials; it must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (internal citations omitted).  Nevertheless, if material facts remain at issue or are susceptible to different inferences, then summary judgment is not

appropriate. *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994.)

### III. Count I: Breach of Contract

In Count I, plaintiff contends that defendant breached the employment agreement by terminating him without cause, failing to act in good faith and use best efforts, not creating Swiss LLC, failing to purchase his equity interest, not paying commissions that were owed, not reimbursing him for costs he had incurred, not paying for monthly insurance premiums, failing to provide tax equalization, and failing to apply for and obtain certain insurance, permits, licenses, and authorizations. In addition, plaintiff claims he is owed $2000 under an oral termination agreement. Defendant responds by arguing that since plaintiff was an at-will employee under the contract, it did not need to have cause to terminate him, and under Tennessee law, any duty of good faith and fair dealing is irrelevant, since such a clause cannot limit or modify the contract's at-will provision. (Def.'s S.J. Motion at 15-18.) Defendant further argues that it had no duty to create a Swiss LLC, and even if there was such an obligation, plaintiff's conduct amounted to a waier of any contractual right to enforce this provision by agreeing that the Swiss LLC would not be advantageous to the parties' interests and acquiescing in the creation of Legalbill Ltd. (*Id.* at 21-22.) Defendant's arguments are, however, both legally and factually flawed.

Defendant proceeds on the mistaken assumption that the contract is unambiguous insofar as it provides that plaintiff is an at-will employee. Even a cursory reading of the contract belies this contention. The contract specifically provides that plaintiff is entitled to receive (in addition to his salary) a 5% "commission on revenue collected from the Swiss LLC's *and* Company's EMEA sales. . . ." and that he cannot be terminated except for cause "so as to deny [him] forthcoming equity ownership interests." (Contract at 2 (emphasis added).) "Termination for

Cause" is clearly defined as, *inter alia*, a failure to substantially perform his duties as an employee. . . ." Finally, defendant commits itself to devote its "best efforts and energy to employee's success *and* the success of the business and affairs of the Swiss LLC and Company" (*Id.* at 3 (emphasis added).)  In the face of these explicit contractual provisions, defendant's reliance on the at-will provision and its claim that the creation of the Swiss LLC was totally within its discretion must be rejected, since contrary to defendant's position, the terms of the contract are far from clear and unambiguous.

Second, treating plaintiff's version of the facts as true, as one must do at this stage, there are clearly disputed issues of fact that preclude the granting of summary judgment.  First, according to plaintiff, no performance deficiencies were ever cited for his termination, but rather, he was told that he was being terminated because defendant believed (erroneously) that plaintiff was an at-will employee and that defendant believed that it should spend its resources in the United States and not in Europe.  (*See* Kroger Decl. ¶ 41.)  Thus, there is a substantial issue of fact regarding whether there was cause for plaintiff's termination.  (*Compare* Kroger Decl. ¶ 31 *with* French Decl. ¶ 19.)  There is also a factual basis upon which a jury could conclude that defendant did not use its best efforts as required by the contract (*see e.g.* Kroger Decl. ¶¶ 35, 36, and 39), and that plaintiff did not waive any rights under the contract, but rather, he was assured that there would be a change in his compensation package to reflect the new organizational structure.  (*See e.g.* Kroger Decl. ¶ 47; Kroger Dep. at 354:10.)  There are also issues of fact regarding whether plaintiff received the monies and benefits that were due under the contract.

In short, there are substantial issues of fact regarding plaintiff's performance under the contract, whether defendant had a basis to be excused from its contractual obligations, and

whether plaintiff's conduct could be construed as a waiver or whether a different equity deal had to be negotiated when the idea of creating Swiss LLC was jettisoned. Given the state of the record, summary judgment on Count I must be denied.

## IV. Counts II - III: Fraud and Misrepresentation

In Count II, plaintiff alleges fraud and intentional misrepresentation. Under Tennessee law, intentional misrepresentation is a necessary element of a fraud claim. *Shahrdar v. Global Housing, Inc.*, 983 S.W.2d 230, 237 (Tenn. Ct. App. 1998). Therefore, the Court will address plaintiff's allegations of fraud and intentional misrepresentation together. The elements required to sustain a traditional fraud action are: (1) an intentional misrepresentation with regard to a material fact; (2) knowledge of the representation's falsity – that the representation was made "knowingly," "without belief in its truth," or "recklessly" without regard to its truth or falsity; (3) that the plaintiff reasonably relied on the misrepresentation and suffered damage; and (4) that the misrepresentation related to an existing or past fact. *Stacks v. Saunders,* 812 S.W.2d 587, 592 (Tenn. Ct. App. 1990). Regarding this last element, the statement of material fact necessarily requires "reasonable specificity" and cannot be vague or general. *McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 132 (Tenn. Ct. App. 1982). For this reason, statements "of opinion or intention are not actionable" to support a claim for fraud. *Id.* at 130; *Henley v. Labat-Anderson, Inc.,* 1991 WL 120403, at *2 (Tenn. Ct. App. 1991); *see also Cumberland Portland Cement Co. v. R. F. C.,* 140 F. Supp. 739 (E.D. Tenn. 1953); *Brungard v. Caprice Records, Inc.*, 608 S.W.2d 585 (Tenn. Ct. App. 1980).

Moreover, under Tennessee law, in order to bring a fraud action based on alleged statements involving future events, one must meet the requirements of "promissory fraud," a type

of fraud perpetrated by means of a false promise of future action.[1]  *See Shahrdar,* 983 S.W.2d at 237.  To show promissory fraud, plaintiff must prove that the alleged misrepresentation "embod[ies] a promise of future action without the present intention to carry out the promise." *Stacks,* 812 S.W.2d at 592.  The promisor's intention must be shown to "be false by evidence other than subsequent failure to keep the promise or subjective surmise or impression of promisee." *Biodynamic Technologies, Inc. v. Chattanooga Corp.*, 658 F. Supp. 266, 268 (S.D. Fla. 1987) (applying Tennessee law).  Although summary judgment is generally not an appropriate vehicle for the disposition of promissory fraud claims, if the only evidence of the promisor's intent to deceive or to not undertake performance is the promisee's subjective beliefs and inferences from surrounding circumstances, then the promisee's claims of fraud should be rejected at the summary judgment stage.  *See Fowler v. Happy Goodman Family*, 575 S.W.2d 496, 499 (Tenn. 1978).  More recently, the Tennessee Court of Appeals has required that "direct proof" is necessary to show a lack of intention, and circumstantial evidence will no longer suffice.  *Eddings v. Sears Roebuck & Co,* 2002 WL 1592540, at *6 (Tenn. Ct. App. 2002).

As an initial matter, several of plaintiff's allegations of misrepresentation were raised for the first time in his Opposition to defendant's Motion for Summary Judgment.[2]  Under Federal

---

[1] Promissory fraud is not a separate cause of action under Tennessee law, as defendant suggests in its reply brief (*see* Def.'s Reply at 20-21).  *Shahrdar*, 983 S.W.2d at 237.  Therefore, the allegations of fraudulent misrepresentation that plaintiff has properly pled are sufficient to have put defendant on notice of a claim for promissory fraud.

[2] In his Opposition, plaintiff introduced new allegations of misrepresentation, which he had not cited in his pleadings or in his deposition testimony.  These include: Legalbill claimed it "had a process patent in the United States and would immediately apply for one in the European Union" (Pl.'s Opp. at 38);  Legalbill claimed that "average customer contract returned over $300,000 annually in gross revenues"; Legalbill claimed that its "profit margins were over 30%"; and Legalbill "would only expect 1-2 EMEA sales by the end of 2003 and that would be the

Rule of Civil Procedure 9(b), fraud must be alleged with particularity in the pleadings. *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1278 (D.C. Cir. 1994). "In order to plead fraud with the particularity required by Fed. R. Civ. P. 9(b), the pleader must state the time, place, and content of the false misrepresentations, the fact misrepresented and what was obtained or given up as a consequence of the fraud." *Bennet Enters. v. Domino's Pizza*, 794 F. Supp. 434, 437 (D.D.C. 1992); *Burman v. Phoenix Worldwide Indus.*, 384 F. Supp. 2d 316, 324-25 (D.D.C. 2005). Even though plaintiff is proceeding *pro se* and is thus entitled to a greater degree of leniency regarding procedural matters, plaintiff is a lawyer with a significant amount of training and experience. Moreover, he did not only leave these allegations out of his complaint and his amended complaint, he also failed to raise them at his deposition despite repeated opportunities to enumerate all of his claims of alleged fraud. (*See e.g.* Kroger Dep. at 185-186:21-1; 188:3-4.) Because plaintiff failed to plead these claims or otherwise give defendant fair notice that he was relying on them, it is simply too late to raise them now. *See U.S. ex rel. Williams v. Martin-Baker Aircraft Co., Ltd.*, 389 F.3d 1251 (D.C. Cir. 2004) (dismissing plaintiff's allegations of fraud because plaintiff did not state the specific time when alleged misrepresentations occurred until his brief); *Hood v. Dryvit Systems Inc.*, 2005 WL 3005612, at *4 (N.D. Ill. 2005) (refusing to consider statements made by plaintiff for the first time in opposition to motion for summary judgment).

Plaintiff has, however, properly raised other claims of alleged misrepresentations – that Legalbill assured plaintiff a 30% interest in all rights to revenues from sales initiated from plaintiff's or EMEA activities (Complaint ¶ 26); that Legalbill claimed to have the financial and

---

basic measurement of reasonable performance through 2003."

other resources to make the EMEA region successful (*Id.* ¶ 27a); that Legalbill claimed to have $1 million dollars available for EMEA development if that amount was necessary (Kroger Dep. at 197); that plaintiff's promised 30% equity interest would generate about $1 million dollars per year in four to six years (Complaint ¶ 27b); that Legalbill claimed it would use its best efforts to maximize revenues generated from EMEA activities, including training plaintiff, involving him in key meetings, providing him with marketing materials suitable for the EMEA market, internationalizing Legalbill's website, and introducing plaintiff to EMEA contacts for existing Legalbill clients (Kroger Dep. at 198); that Legalbill would provide plaintiff marketing materials from an outside marketing firm (Kroger Dep. at 198); that Legalbill would promptly create a Swiss LLC (*Id.*); that plaintiff would get credit for accounts that the EMEA generated (*Id.* at 20.); and that he would be paid monthly. (*Id.* at 17.)

These allegations, however, do not satisfy the elements of a traditional fraud claim under Tennessee law. With respect to plaintiff's allegations that Legalbill claimed to have all the financial and other resources to make the EMEA region successful and that Legalbill claimed to have $1 million dollars available for EMEA development, plaintiff has failed to demonstrate that these amounted to misrepresentations. *See McElroy*, 632 S.W.2d at 131. There is no evidence to support the inference that at the time these statements were made, Legalbill did not have the financial wherewithal and resources to make the EMEA region successful or that it did not have $1 million dollars available for EMEA development; rather, the evidence suggests that Legalbill chose not to spend the funds or make the resources available to plaintiff. *See id*. (defendant's statement that he had the skills and knowledge to construct plaintiff's house according to plaintiff's specifications did not constitute a misrepresentation merely because defendant

ultimately did not do so).

The remaining misrepresentations also fail to satisfy the elements of a traditional fraud claim because they do not relate to past or existing facts, but rather, they are based on "conjecture and future intentions." *Gardner v. Anesthesia & Pain Consultants*, 2004 WL 2715304, at *7 (Tenn. Ct. App. 2004) (promise to an anesthesiologist that he would soon receive a two-year written employment contract if he would relocate and start work did not relate to a past or existing fact); s*ee also Henley,* 1991 WL 120403, at *2 (representations of an employer's plans for continued employment were judged to be statements of expectation and conjecture and thus not actionable as misrepresentations); *Fowler*, 575 S.W.2d at 499 (representations to a concert promoter that a musical group would reduce its future performance fees if the promoter entered into a series of contracts do not relate to a past or existing fact). Since Tennessee courts have strictly construed the requirement that the fraud be based on a claim relating to a past or present fact, plaintiff cannot proceed with a traditional fraud or misrepresentation action.

Nor can plaintiff make out a claim for promissory fraud. Plaintiff bears the burden of proving that Legalbill made promises without intending to perform, *Sanders v. First Nat'l Bank*, 114 B.R. 507, 516 (M.D. Tenn. 1990), and mere affidavits recounting plaintiff's subjective belief that defendant had no present intent to perform its promises are not considered sufficient proof. *Id.* at 516; *see also Fowler*, 575 S.W.2d at 499. In this case, plaintiff relies only on his declaration to support his fraud allegations. He asks the Court to infer from the termination agreement and the contract's at-will clause that defendant had a deceitful plan to deprive plaintiff of any potential success from the inception of the parties' dealings. (*See* Pl.'s Opp. at 44.) Plaintiff's proffered evidence, however, falls far short of Tennessee's requirement that "direct

proof" must be offered to show a promisor's lack of intention. *Eddings,* 2002 WL 1592540, at *5.

For the same reasons that plaintiff cannot proceed with his fraud claim, his claim for negligent misrepresentation in Count III must also fail as a matter of law. The analysis of a negligent misrepresentation claim is similar to that of fraudulent misrepresentation: "Although an action for negligent misrepresentation replaces the scienter requirement in fraudulent misrepresentation with a less stringent reasonable care standard, the misrepresentation still must consist of a statement of a material past or present fact." *Henley,* 1991 WL 120403, at *2 (quoting *McElroy*, 632 S.W. 2d at 130). As described above, plaintiff's allegations either fail because they do not constitute misrepresentations or because they do not relate to a past or present fact. Therefore, the Court will grant defendant's motion with respect to Count III.

## V. Count IV: Constructive Trust

Since defendant's motion for summary judgment has been granted as to Counts II and III, plaintiff has no viable claim to a constructive trust. A constructive trust is an equitable remedy, used by courts "when property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest." *Stewart v. Sewell*, 2005 WL 873304, at *11 (Tenn. Ct. App. 2005). For a constructive trust to be imposed, "[s]ome element of fraud, concealment, duress, etc." is "required." *Id.*; *see also Roach v. Renfro,* 989 S.W.2d 335, 340-341 (Tenn. Ct. App. 1998). In this case, plaintiff cannot sustain his action for fraud so he has no right to imposition of a constructive trust.

## CONCLUSION

For the above reasons, defendant's motion is denied as to Count I, but is granted as to Counts II, III, and IV.  This case is set for a status on July 26, 2006 at 2:30p.m.


                                                              s/
                                            ELLEN SEGAL HUVELLE
                                            United States District Judge

Date: July 6, 2006